UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

CRAIG & LYNDA HERREMANS,

     Debtors.

_____/

CRAIG ALAN HERREMANS,

     Plaintiff & Counter-Defendant,

-vs-

RANDY FEDO,

     Defendant & Counter-Plaintiff.

_____/

Case No.  BG 15-01567
Chapter 12

Adversary Proceeding
No. 17-80086

## OPINION REGARDING REMEDY FOR SHAREHOLDER OPPRESSION AND DAMAGES FOR AUTOMATIC STAY VIOLATION

Appearances:

Jonathan R. Moothart, Esq., Williamsburg, Michigan, and Donald H. Passenger, Esq., Grand Rapids, Michigan, attorneys for Plaintiff and Counter-Defendant Craig Alan Herremans.

Paul A. Ledford, Esq., Grandville, Michigan, and Nicholas S. Laue, Esq., Grand Rapids, Michigan, attorneys for Defendant and Counter-Plaintiff, Randy Fedo.

I.       INTRODUCTION.

In this bitter and hotly contested battle over the fate of a Ponderosa restaurant in Ludington, Michigan, the only thing the owners have not argued about is the food.  This adversary proceeding is a tale of two partners, who started their restaurant twenty-seven years ago on a handshake, and whose falling out has evolved into stone-cold silence

between them.  Rather than addressing their disputes by talking to each other, bringing in a third party to break the deadlock, or otherwise seeking assistance in reaching reasonable agreements, they instead directed their attorneys to pursue contentious litigation in an all-out effort to wrest control of the restaurant from the other or force a liquidation.  The events that followed can only be described as "good people doing bad things," as each party took unilateral actions that were potentially detrimental to the other, all while clinging to their subjective belief that the bad acts were justified by the other party's equally bad behavior.  Now, after twenty-seven years in business, twelve years of near silence between the two of them, years of litigation, many thousands of dollars in attorneys' fees, and eight years of bankruptcy protection, the parties have turned to this court to sort out what happens next with the Ponderosa restaurant.

The complaint and counterclaim in this proceeding identify a long list of alleged wrongs that both parties believe have occurred in the most recent chapter of their business relationship.  After a four day trial, this court gave a bench opinion setting forth its findings of fact and conclusions of law on the liability issues raised by the complaint and counterclaim.  In short, the court held that Randy Fedo (herein "Fedo" or the "Defendant") willfully oppressed the rights of Craig Herremans (herein "Herremans," the "Plaintiff," or the "Debtor") as a shareholder in Ran-Starr, Inc. when he used corporate funds to pay personal attorney's fees incurred in state court litigation against Herremans, in the chapter 12 base case, and in this adversary proceeding.  The court also determined that Fedo violated the automatic stay in this bankruptcy case by seeking entry of an *in personam* money judgment against Herremans, and his wife Lynda Herremans, in a state court foreclosure action relating to Herremans' interest in the Ran-Starr stock.  For his

part, the court found that Herremans also willfully oppressed Fedo's rights as a shareholder in Ran-Starr when he unilaterally withdrew $15,000 from a Ran-Starr bank account.  At the conclusion of the bench opinion, the court invited Herremans to file a bill of costs relating to the stay violation and directed both parties to file additional legal memoranda regarding the appropriate remedy for the shareholder oppression claims. The parties also requested a brief period to time to make one last attempt at reaching a settlement.  The court granted this request, but settlement did not occur.  After a hearing on the remaining issues in the proceeding, the court determined to issue this opinion, which constitutes the court's findings and conclusions regarding the appropriate damages and remedies.

## II.   JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); LGenR 3.1(a) (W.D. Mich.).  The automatic stay violation alleged in the amended complaint constitutes a core proceeding.  28 U.S.C. § 157(b)(2)(A) and (G). The state law causes of action alleged in the amended complaint and in the counterclaim are non-core, related proceedings.  Both parties have consented to this court entering a final order in this adversary proceeding.  (*See* Plaintiff's Consent to Court's Entry of Final Order on Non-Core Proceedings, AP Dkt. No. 50; Defendant's Consent to Court's Entry of Final Order on Non-Core Proceedings, AP Dkt. No. 97.)

### III.    SUMMARY OF PRIOR LIABILITY DETERMINATION.

As noted, the court previously held a four day trial in this adversary proceeding, at which it heard testimony from seven witnesses and admitted numerous exhibits into evidence.[1]  Based on that trial record, the court gave a bench opinion on the liability issues on December 19, 2022 (referred to herein as the "Liability Opinion").[2]  The court will not re-state that opinion in its entirety, but will highlight the most important findings and conclusions as follows:

A. *Summary of Liability Findings of Fact*.

Herremans and Fedo became friends in 1995, and eventually decided to open a Ponderosa franchise in Ludington, Michigan.  (Opinion Tr. at 5.)  Fedo formed Ran-Starr, Inc., on February 7, 1996, by filing articles of incorporation.  (*Id.*)  The corporation has never had corporate bylaws, nor have there been meeting minutes.  (*Id.*)  Herremans and Fedo are 50-50 shareholders in Ran-Starr, and the annual filings with the state have always listed Fedo as president and treasurer and Herremans as vice president and secretary.  (Opinion Tr. at 5-6.)

Herremans and Fedo operated Ran-Starr amicably for many years, participating equally as decision makers and acting as 50-50 partners "down the line."  (Opinion Tr. at 7-8.)  However, two events significantly cooled the parties' relationship.  (*Id.* at 8.)  The first occurred in 2012, when Herremans approached Fedo about obtaining health insurance for his wife, Lynda.  (*Id.* at 8-9.)  In a conversation Herremans described as

---

[1]    The trial transcript is available on the court's docket at AP Dkt. Nos. 162, 163, 164, & 165 and is cited herein as "Trial Transcript at __."  Exhibits admitted into evidence or referenced at the trial are cited herein as "Plf. Exh. __" or "Dft. Exh. __."

[2]    The transcript of the Liability Opinion is available on the court's docket at AP Dkt. No. 184 and is cited herein as "Opinion Tr. at __."

"not very pleasant," Fedo refused that request because Ran-Starr's historic practice was to only provide insurance for managers and their families. (*Id.* at 9.)  After this, Herremans spent less time at the Ponderosa, limiting his visits to eating meals there two or three times a month and checking in with the mangers on how things were going. (*Id.*)  Even so, Herremans testified that he trusted Fedo to do a good job running the restaurant at that time. (*Id.*)

The second event that negatively affected the parties' relationship was when the Herremans filed for chapter 12 bankruptcy protection on March 19, 2015.  (Opinion Tr. at 9.)  Neither Ran-Starr nor Fedo was listed on the bankruptcy schedules or given notice of the bankruptcy case, notwithstanding the fact that Fedo was a creditor as a result of a loan to Craig Herremans.[3] (*Id.* at 9-10.)  Although there was initially some dispute on this point, the parties ultimately stipulated that the loan was secured by Herremans' interest in Ran-Starr. (*Id.* at 10.)  As a result of the bankruptcy case, Fedo learned that Herremans had also pledged his interest in Ran-Starr as collateral to Chemical Bank. (*Id.*)

There was contentious litigation concerning the allowance of Fedo's claim in the bankruptcy case.  (Opinion Tr. at 10.)  These issues were ultimately resolved by a settlement under which Fedo's claim was allowed as fully secured in the approximate amount of $185,000 and which required Herremans to make monthly payments to Fedo. (*Id.*)  The overall settlement also addressed Chemical Bank's competing security interest in Herremans' Ran-Starr stock by providing that to the extent the stock was sold, the net

---

[3]     This omission may have been exacerbated by the fact that the Herremans had also filed a previous bankruptcy case on August 29, 2013, and there was no evidence that Fedo or Ran-Starr had notice of this prior bankruptcy case either.  (Opinion Tr. at 10-11.)  That case was ultimately dismissed on March 6, 2015.  (*Id.* at 10-11.)

proceeds would be divided with 60% going to Chemical and 40% going to Fedo.[4]  (*Id.* (citing Sixth Pre-Confirmation Plan Amendment, Base Case Dkt. No. 140).)  The terms of this settlement were incorporated into the Herremans' chapter 12 plan, which was confirmed by this court on February 9, 2016.  (*Id.* (citing Order Confirming Plan, Base Case Dkt. No. 142).)

After the filing of the bankruptcy case in 2015, the parties' relationship further deteriorated. (Opinion Tr. at 12.)  Herremans cited a long list of actions taken by Fedo that were detrimental to his interests as a Ran-Starr shareholder.   For instance, Herremans noted that shareholder distributions from Ran-Starr, which had previously been made periodically and with the agreement of both parties, stopped completely after May of 2015.  (*Id.* at 11.)  An annual Pepsi rebate and certain vending machine proceeds that the parties had previously split also stopped being paid around this time.  (*Id.*)  In addition, in July 2015, Fedo effectively eliminated Herremans' signatory authority and access to Ran-Starr's account at Huntington National Bank by submitting new signature cards to the bank.  (*Id.* at 12.)  Finally, in August 2015, Fedo entered into an agreement with Ran-Starr whereby Fedo acquired an additional 1,000 shares of stock, thus making him the majority shareholder.   (*Id.* at 12-13.)   The stock issuance was eventually rescinded in March of 2016, upon the involvement of Herremans' counsel.  (*Id.* at 13.)

Not to be outdone, Herremans also committed his share of bad acts during this time period.  Most significantly, on May 11, 2017, he unilaterally withdrew $15,000 from Ran-Starr's account at Shelby State Bank without Fedo's knowledge or consent.  (Opinion Tr. at 13.)  He admitted at trial that he never accounted for this withdrawal to his chapter

---

[4]      Chemical Bank's interest in Herremans' Ran-Starr stock was subsequently assigned to Gerald and Bernice Shafer.

6

12 trustee or to the court, but also testified that some of the funds were paid to creditor American Farm Mortgage.  (*Id.*)  In addition, notwithstanding his knowledge of his potential claims against Fedo, Herremans did not schedule those claims or otherwise disclose them in his bankruptcy case until March 13, 2019.  (*Id.*)  This was twenty-one months after this adversary proceeding was filed and more than three years after the Herremans' chapter 12 plan was confirmed.  (*Id.* at 13-14.)

The Herremans ultimately defaulted on their obligations to Fedo under their chapter 12 plan.  (Opinion Tr. at 14.)  This court granted Fedo's subsequent motion for relief from stay in an order entered on July 27, 2016, which provided that the "automatic stay is terminated as to Debtor's 50% interest in the Ran-Starr Stock pursuant to 11 U.S.C. § 362(d)(1)."  (*Id.* (citing Base Case Dkt. No. 177).)  Fedo then filed a lawsuit in the Oceana County Circuit Court to liquidate Herremans' interest in the Ran-Starr stock. (*Id.*)  The parties have referred to this as the "foreclosure action."

In May of 2021, the state court granted Fedo's motion for summary judgment in the foreclosure action.  (Opinion Tr. at 14 (citing Dft. Exh. S).)  Among other things, the state court found that the amount of the debt owed by Craig Herremans to Fedo was $184,920.41 and that it was secured by Herremans' Ran-Starr stock.  (*Id.*)  More than a month later, Fedo, though counsel, submitted a proposed Order of Judgment which provided for entry of a money judgment against both Craig and Lynda Herremans for the full amount of the debt.  (*Id.* (citing Plf. Exh. 17).)  The proposed order drew an objection from counsel for the Herremans.  (*Id.* (citing Plf. Exh. 18).)  After a hearing, the state court entered its own order which provided that the amount of the debt owed by the Herremans was $184,920.41 and that Fedo could "not make any effort to collect" this amount "other

7

than to foreclose upon Craig Herremans' Ran-Starr stock, in a manner approved by this court, until the Bankruptcy Court lifts its stay."  (*Id.* at 15 (citing Dft. Exh. T).)

After entry of the state court's foreclosure order, Fedo filed a motion to approve bidding procedures and sale of property in the state court.  (Opinion Tr. at 15 (citing Plf. Exh. 19.)  The state court ultimately entered an order setting the terms of the foreclosure sale in November 2021.  (*See* Base Case Dkt. No. 386, at Exh. A.)  As of the date of the of the Liability Opinion, the state court foreclosure sale had been scheduled, but had not yet occurred.  (Opinion Tr. at 51; Base Case Dkt. No. 394.)  Although the conduct and terms of the state court foreclosure sale have been a source of disagreement between the parties, they have generally agreed that the results of the state court foreclosure sale would ultimately be subject to approval by this bankruptcy court.[5]  This is primarily to ensure that the proceeds are appropriately split between Gerald and Bernice Shafer, as successors in interest to Chemical Bank, and Fedo under the 60-40% formula, and that any surplus or deficiency is treated in accordance with the Herremans' confirmed plan.[6]

---

[5]     *See, e.g.*, Debtors' Emergency Motion for Stay of Commercially Unreasonable Sale of Stock, Base Case Dkt. No. 386; Fedo's Response, Base Case Dkt. No. 393, at p. 8 (acknowledging that this court "will need to approve the foreclosure sale" to ensure compliance with the confirmed plan).

[6]     In addition to providing for the 60-40% split of any sale proceeds, the Sixth Pre-Confirmation Plan Amendment provides:

In the event a sale, conveyance, or liquidation of all or any of Debtor Craig Herremans' interest in Ran-Starr, Inc., realizes net proceeds in excess of the amount of Chemical Bank's and Randy Fedo's claims, Craig Herremans shall be entitled to the remaining net proceeds. Any sale, conveyance, or liquidation of Chemical Bank's collateral, including Debtor Craig Herremans' interest in Ran-Starr, Inc., shall be done in a commercially reasonably [sic] manner and any objection to the manner of the sale, conveyance, liquidation, or the price of such sale, conveyance, or liquidation, may be brought before the Court upon proper objection or motion.
. . . .

8

The evidence submitted at trial also established that Ran-Starr paid a total of $25,793 in legal fees to Attorney Ledford for work that benefitted Fedo personally from January 2017 to October 2019.  (Opinion Tr. at 17-18.)  Specifically, the invoices from Ledford and Associates, and which were paid by Ran-Starr, established that the majority of legal work during this time period was undertaken to pursue Fedo's claims against Herremans in the foreclosure action, another state court action pertaining to the $15,000 Huntington Bank withdrawal (which the parties have referred to as the "embezzlement action"), the bankruptcy case, and this adversary proceeding.  (*Id*. at 17 (citing Redacted Plf. Exh. 1-X[7]).)

B. *Summary of Liability Conclusions of Law*.

Based on these findings of fact, the court analyzed the various legal claims asserted by the parties.  As to Herremans' claim for shareholder oppression, the court determined that the doctrine of judicial estoppel barred Herremans from asserting claims for actions that occurred prior to confirmation of his chapter 12 plan on February 9, 2016, and which were known to him before that time.  (Opinion Tr. at 24-30.)  This included the claims stemming from the Huntington Bank account change and the stock issuance, both

---

In addition to the annual payments provided for above, Debtor Craig Herremans shall use his best efforts to sell his interest in Ran-Starr, Inc., within five years from the date that the Debtors' Chapter 12 Plan of Reorganization is confirmed. The net proceeds from any sale shall be distributed as set forth in this Sixth Pre-Confirmation Amendment to Chapter 12 Plan. In the event the net proceeds payable to Randy Fedo do not satisfy his claim against Debtors, Debtors shall continue to make annual payments in the sum of $18,000.00 to Randy Fedo in October of each year until the [sic] Mr. Fedo's claim is paid in full.

*See* Base Case Dkt. No. 140, at p. 2-3.

[7]    Plaintiff's Exhibit 1-X was referred to during the trial but was not admitted into evidence at that time.  After the conclusion of trial, the parties stipulated to admission of Exhibit 1-X in redacted form.  (*See* Order Admitting Trial Exhibit 1-X as Evidence Without Objection, AP Dkt. No. 159.)

of which occurred in 2015, after the filing of the bankruptcy case and before confirmation. (*Id.* at 28.)  The court found that the elements of judicial estoppel were met with regard to these claims because:  (1) there was "no question" Herremans knew about these claims prior to confirmation of his plan, yet he did not disclose them or otherwise account for them in his bankruptcy schedules until nearly four years after the case was filed (*Id.*); (2) he had a motive to conceal these causes of actions from the trustee, the court, and his creditors (*Id.* at 28-29), and (3) his failure to disclose the claims was not the result of mistake or inadvertence, but instead, was done in bad faith.  (*Id.* at 29-30.)  The court equated Herremans' failure to disclose his claims against Fedo to a representation that the claims did not exist.  (*Id.* at 30.)  As a result, the court held that judicial estoppel prohibited Herremans from bringing a cause of action for shareholder oppression or violation of the stay based on the stock issuance or his lack of access to the Huntington bank account.  (*Id.* at 30.)

With regard to the balance of Herremans' shareholder oppression claims, the court credited Herremans' assertion that the actions on which those claims were based either did not occur until after confirmation or that they occurred in secret, such that he was not aware of those claims prior to confirmation of his plan.  (Opinion Tr. at 28.)  Even so, the court determined that many of the actions Herremans complained of – including the failure to make distributions and split other proceeds (*Id.* at 32-35), the fact that Craig Herremans had "no say" when it came to making decisions for Ran-Starr (*Id.* at 35), the fact that Ran-Starr provided a salary to Fedo's wife, who works as a manager at the Ponderosa, and health insurance to Fedo's family (*Id.* at 35-36), and the corporation's payment of a high rate of interest on loans from Fedo (*Id.* at 36-38)  – were not unfair or oppressive to

10

Herremans and did not interfere with his interests as a shareholder. In so holding, the court noted that many of these actions were consistent with Ran-Starr's historic practice. (*See, e.g.*, *Id.* at 33; 36.) Others, like Herremans' lack of participation in corporate operations and decision-making, were the result of his voluntary disengagement from Ran-Starr, not actions taken by Fedo. (*Id.* at 35.)

There was, however, one significant action taken by Fedo that the court determined was oppressive to Herremans' interest as a shareholder in Ran-Starr: Fedo's use of corporate funds to finance litigation against Herremans. (Opinion Tr. at 38-42.) The court found that the evidence submitted at trial established that Ran-Starr's corporate funds, in the total amount of $25,793, were used to make payments to Ledford and Associates for legal work relating to representation of Fedo's personal interests in this adversary proceeding, the underlying bankruptcy case, and the state court foreclosure and embezzlement actions. (*Id.* at 38-39.) Because Ran-Starr's assets were effectively owned by its two shareholders on a 50-50 basis, Fedo's use of corporate funds to pay personal legal expenses necessarily reduced the value of Herremans' interest in those assets. (*Id.* at 40.) These actions by Fedo were willful, egregious, and occurred over a long enough period to constitute oppression of Herremans' interest as a Ran-Starr shareholder.[8] (*Id.* at 39-40.)

---

[8] In reaching this conclusion, the court also held that the other elements of Herremans' shareholder oppression claim were undisputed: Herremans was and is a shareholder of Ran-Starr; although the shares of Ran-Starr were owned by Herremans and Fedo on a 50-50 basis, Fedo admitted that he is, and always has been, the managing shareholder; and all of the actions alleged by Herremans were taken by Fedo. (Opinion Tr. at 31; *see also* Opinion Tr. at 21 (citing *Franks v. Franks*, 944 N.W.2d 388, 404 (Mich. Ct. App. 2019) regarding the requisite elements of a shareholder oppression claim under Mich. Comp. Laws § 450.1489).)

With regard to Herremans' claims for violation of the automatic stay, the court determined that it had lifted the automatic stay to allow Chemical Bank and Fedo, both of whom held security interests in Herremans' Ran-Starr stock, to pursue their foreclosure remedies in state court.  (Opinion Tr. at 42.)  However, the automatic stay as to the Herremans personally remained in effect by virtue of their confirmed chapter 12 plan.  (*Id*.) Despite this fact, after successfully moving for summary disposition on his claims in the state court foreclosure action, Fedo submitted a proposed order to the state court which would have granted him a money judgment against both Craig and Lynda Herremans for the full amount of Fedo's prepetition claim.  (*Id*.)  Fedo took this action with full knowledge of the bankruptcy case, and by extension, the automatic stay.  (*Id*. at 42-43.)  For those reasons, the court held that Fedo's action in seeking an *in personam* money judgment against the Herremans constituted a willful violation of the automatic stay.  (*Id*. at 43.)

Finally, the court considered Fedo's counterclaims against Herremans.  The court found the majority of Fedo's counterclaims lacking in evidentiary support. (Opinion Tr. at 44-45; 47.)  However, the court determined that Fedo had established a valid claim for shareholder oppression against Herremans stemming from the unilateral $15,000 withdrawal from Shelby State Bank.  (*Id.* at 45.)  The court held that, in the same way that Fedo's diversion of corporate funds to pay personal attorney's fees was willfully unfair and oppressive to Herremans' interest as a Ran-Starr shareholder, Herremans' unilateral withdrawal of funds for his personal benefit was equally unfair and oppressive to Fedo's interest as a shareholder.[9]  (*Id*.)

---

[9]     In its analysis of Fedo's claims, the court noted that a primary issue was whether Herremans had sufficient control of Ran-Starr to commit shareholder oppression. (Opinion Tr. at 46 (citing *Young v. VanderMeer*, No. 349093, 2021 WL 744532, at *7 (Mich. Ct. App. Feb. 25, 2021) (unpublished opinion) (addressing the issue of control as between 50-50 shareholders and

At the conclusion of the court's Liability Opinion, the court deferred making a final determination on the appropriate remedy for the respective shareholder oppression claims or the amount of damages for the stay violation.  (Opinion Tr. at 47-48; 52.)  The court's reasoning on this point was informed by the fact that the state court foreclosure sale had not yet occurred as of the date of the Liability Opinion.  (*Id*. at 51.)  The court noted, however, that its future determination about the appropriate remedy for the shareholder oppression claims would require consideration of the historical context of Ran-Starr's operation and the bad acts committed by both parties.  (*Id.* at 50.)

C.   *Post-Liability Opinion Events*.

According to reports filed by the parties after issuance of this court's Liability Opinion, the foreclosure sale was held at the Oceana County Courthouse on December 21, 2022.  (AP Dkt. Nos. 173 & 174.)  Fedo was the highest bidder, having offered to purchase Herremans' Ran-Starr stock for $150,000.  (*Id*.)  Herremans' numerous objections to the foreclosure sale process are the subject of an Objection to Sale that is currently pending in the base case.  (Base Case Dkt. No. 398.)

Pursuant to a scheduling order issued by the court, the parties also filed legal memoranda addressing the outstanding issues regarding remedies for the shareholder oppression claims and damages for the stay violation in this adversary proceeding.  (*See* AP Dkt. Nos. 185-188.)  A hearing on the remedies and damages issues was held before

---

holding that the shareholder oppression statute does not require proof that the oppressed party was a minority shareholder but only that the party engaging in the oppressive conduct was "in control during the relevant time period").)  Although Herremans did not exercise his control over Ran-Starr as regularly and frequently as Fedo did, he was a 50 percent shareholder and corporate officer who clearly had access to corporate funds.  (Opinion Tr. at 46.)  Under the circumstances, the court determined that Herremans was exercising control over Ran-Starr when he made the unilateral withdrawal.   (*Id*.)

this court on April 13, 2023.  At the conclusion of the hearing, the court took the various

matters under advisement.

IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES AND REMEDIES.

A.   *Remedy for Shareholder Oppression*.

The Michigan shareholder oppression statute gives this court broad discretion to

craft an appropriate remedy for the oppressive conduct that has occurred in this case.

*See* Mich. Comp. Laws § 450.1489(1);[10] *Franks v. Franks*, 944 N.W.2d 388, 410 (Mich.

Ct. App. 2019) (discussing the trial court's "broad authority" to fashion a remedy for

---

[10]    The relevant portion of the statute provides as follows:

(1) . . . . If the shareholder establishes grounds for relief, the circuit court may make an order or grant relief as it considers appropriate, including, without limitation, an order providing for any of the following:

(a) The dissolution and liquidation of the assets and business of the corporation.

(b) The cancellation or alteration of a provision contained in the articles of incorporation, an amendment of the articles of incorporation, or the bylaws of the corporation.

(c) The cancellation, alteration, or injunction against a resolution or other act of the corporation.

(d) The direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action.

(e) The purchase at fair value of the shares of a shareholder, either by the corporation or by the officers, directors, or other shareholders responsible for the wrongful acts.

(f) An award of damages to the corporation or a shareholder. An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued, or within 2 years after the shareholder discovers or reasonably should have discovered the cause of action under this section, whichever occurs first.

Mich. Comp. Laws § 450.1489(1).

shareholder oppression that is appropriate under the circumstances and suits the equities of the case).   In addition to the straightforward option of awarding damages to the oppressed party, *see* Mich. Comp. Laws § 450.1489(1)(f), there are two remedies that are specifically directed at separating deadlocked shareholders like Fedo and Herremans. The first is set forth in Mich. Comp. Laws § 450.1489(1)(e), which permits the court to direct the purchase at fair value of the shares of an oppressed shareholder by the shareholder responsible for the wrongful acts.  The other is the dissolution and liquidation of the assets and business of the corporation under Mich. Comp. Laws § 450.1489(1)(a). However, dissolution and liquidation should be ordered only in exceptional circumstances and when "corporate ruin will inevitably follow continuance of present management." *Barnett v. Int'l Tennis Corp.*, 263 N.W.2d 908, 918 (Mich. Ct. App. 1978).  On the other hand, the purchase of shares is dependent upon the ability of the purchasing shareholder to either pay cash for, or finance, the purchase of the other shareholder's interest as well as on a determination of "fair value" under the statute.

As the court held in its Liability Opinion, Fedo is currently operating the Ponderosa restaurant without any communication with or input from Herremans. In short, the business relationship is dysfunctional and must come to an end.  The parties have proven themselves to be unable to resolve their differences or to end the relationship, so the court must do it for them.  Accordingly, the court has determined that the appropriate remedy for Fedo's oppressive conduct – specifically, his use of corporate money to fund litigation against Herremans – is to order Fedo to purchase Herremans' Ran-Starr shares at "fair value."  Although both parties have committed oppressive conduct in this case, the court notes that it has elected to order Fedo to buy out Herremans, and not the other way

15

around, for several reasons.  First, Fedo is currently in control of Ran-Starr and has been for some time.  In part because of this level of control, the court believes that Fedo's conduct over the course of the parties' business relationship has been relatively more oppressive and egregious than Herremans' actions.   Finally, and perhaps most importantly, Herremans is currently a chapter 12 debtor who almost certainly lacks the financial wherewithal to buy out Fedo's interest in Ran-Starr.  Fedo, on the other hand, has consistently expressed a desire to continue operating the Ponderosa and may have the financial ability to do so.  In this sense, even though the buyout is being ordered primarily as a remedy for Fedo's own oppressive conduct, it is consistent with his overall goals regarding the business.  As explained in greater detail below, the remedy for Herremans' oppressive conduct – the unilateral withdrawal of the $15,000 from Ran-Starr's bank account – is also accounted for in the court's analysis of the "fair value" of the stock.

1.   Legal Standard for Determining "Fair Value."

A recent decision by the Michigan Court of Appeals, *Franks v. Franks*, 944 N.W.2d 388 (Mich. Ct. App. 2019), is instructive on the legal standard this court is to apply when determining the "fair value" of Herremans' interest in Ran-Starr.  The *Franks* court observed that the term "fair value" is not defined in the shareholder oppression statute but found it noteworthy that the legislature choose the term "fair value" instead of "fair market value."  *Id.* at 409-10.  The court explained that "fair market value" is generally understood to mean "the amount of money that a ready, willing, and able buyer would pay for the asset on the open market."  *Id.* at 409 (quoting *Wolfe-Haddad v. Oakland County*, 725 N.W.2d 80 (Mich. Ct. App. 2006)).  Because this definition accounts for the

16

fact that "a ready, willing, and able buyer might discount the value of the shares on the basis of limitations inherent in the shares," such as discounts for marketability or lack of control, the *Franks* court recognized that use of a "fair market value" standard in the context of shareholder oppression claims might open the door for majority shareholders "to force out the minority without paying a fair share of the enterprise's value." *Id.* As a result, the *Franks* court concluded that "fair value" as used in the Michigan shareholder oppression statute is not necessarily synonymous with "fair market value" and that application of discounts in the valuation analysis is neither precluded nor required. *Id.* at 410. Instead, the court is charged with fashioning an "appropriate" remedy for the oppression that occurred, "which may include an order to purchase shares at 'fair value' or at any other value that the court concludes is appropriate under the totality of the circumstances." *Id.* at 411. Factors that may be relevant to this determination include "the stock's market price, the corporation's earning capacity, the investment value of the shares, the nature of the business and its history, the economic outlook of the business and the industry, the book value of the corporation, the corporation's dividend paying capacity, and the market price of stock of similar businesses in the industry." *See Brynwood Co. v. Schweisberger*, 913 N.E.2d 150, 162 (Ill. App. Ct. 2009) *cited with approval in Franks*, 944 N.W.2d at 410.

In addition to identifying the appropriate valuation method, it is also important to determine the date as of which the fair value of Herremans' Ran-Starr shares should be calculated. Again, the Michigan shareholder oppression statute does not specify the date as of which valuation should occur. In other jurisdictions, oppression buy-out statutes and the courts applying those statutes generally base their determination of fair value as

of the date immediately before the petition for dissolution (or other legal action) was filed or the date just prior to when the oppression occurred.  2 *O'Neal and Thompson's Oppression of Minority Shareholders & LLC Members*, § 7:20.  The rationale for utilizing one of these dates as the valuation benchmark is that, in most instances, they best approximate the point at which the minority shareholder is no longer entitled or required to participate in changes to the company's value – either because the shareholder has been "frozen out" of management (in which case the date of oppression might be used) or because the shareholder has formally requested an end to his or her shareholder status (in which case the date of filing might be more appropriate).  *See* Douglas K. Moll, *Shareholder Oppression & "Fair Value": Of Discounts, Dates, & Dastardly Deeds in the Close Corporation*, 54 Duke L.J. 293, 382-83 (Nov. 2004).  The statutes and case law also give courts the authority to set an alternative date in most instances.  *O'Neal & Thompson's*, at § 7:20.  Michigan courts have not directly addressed this question, but at least one prior opinion has implicitly endorsed valuing the oppressed party's interest as of the date just before the oppressive conduct began.  *See Moore v. Carney*, 269 N.W.2d 614, 617 (Mich. Ct. App. 1978) (affirming trial court's valuation of stock interest as of the date just prior to when the oppressive and unjust acts against the minority shareholder began).

   2.   <u>Summary of Trial Evidence Pertaining to Valuation.</u>

The evidence introduced at trial regarding the value of Ran-Starr was somewhat limited.  Of course, both Fedo and Herremans testified to their general beliefs regarding the value of the business.  Predictably, their assessments were mostly polar opposites. Fedo opined that the value of the business itself was a "goose egg."  (Trial Tr. at 130.)

Without providing specifics, Herremans disagreed entirely, based on the general assertion that the Ludington restaurant was a much higher quality than other Ponderosas. (Trial Tr. at 456-57.)   Even so, Herremans has argued throughout this proceeding – including as recently as the damages hearing[11] – that Ponderosa is a "dying brand" and that the bulk of the value of the business is in the real estate itself.  This view was generally supported by the evidence at trial.  That evidence included the testimony of Brad Hansen, President and CEO of the company that oversees Ponderosa franchises, who testified that the brand is "a lot" less popular than it used to be, with only fifteen or so Ponderosa restaurants remaining in the country.  (Trial Tr. at 335.)  This view was also supported by select Ran-Starr Profit and Loss Statements and tax returns, which (to the extent they are accurate and reliable) show that Ran-Starr had positive, but not very significant, net income in most years.  (*See, e.g.*, Plf. Exh. 1-L, showing $35,650.15 in net income for 2016.)

The parties also previously commissioned an expert opinion on the value of the business from Paul A. Wassink of The CPA Group, P.C.  The report, which valued Herremans' fifty percent interest in Ran-Starr as of November 30, 2017, was included among both parties' proposed exhibits and was used by both sides to question witnesses at trial.  (*See* Plf. Exh. 1-H; Dft. Exh. G.)  For instance, Fedo testified that he generally agreed with the Wassink valuation.[12]  (Trial Tr. at 42.)  Wassink himself, however, was not called to testify and neither party moved to admit his expert report into evidence.

---

[11]     *See* Transcript of Hearing Regarding Remedies and Damages, AP Dkt. No. 189 at 9; 19-20.

[12]     This was consistent with Fedo's prior deposition testimony, which was also referenced at trial, but the transcript of which was not admitted into evidence.  (*See* Plf. Exh. 1.)

The other evidence at trial mostly pertained to the valuation of Ran-Starr's assets. The primary evidence on this front came from the testimony of Stacey L. Broersma who conducted an appraisal of Ran-Starr's real estate, located at 4687 West U.S. 10 Highway in Ludington (referred to herein as the "Broersma Appraisal;" *see* Plf. Exh. 1-K).  Based on her appraisal of the business premises, Broersma testified that it was her opinion that the real property had a value of $665,000 as of February 22, 2018.  (Trial Tr. at 312; Plf. Exh. 1-K.)  This amount excluded the value of any furniture, fixtures, and equipment, as well as any going-concern value of the business itself.  The court found both the Broersma Appraisal, and Ms. Broersma's expert testimony regarding the report, credible.  The court also notes that no competing appraisal, expert testimony, or other persuasive evidence contravening the Broersma Appraisal was offered.

The other evidence of asset value that was admitted at trial was limited to select Ran-Starr corporate balance sheets from 2006 through 2019 (*see* Plf. Exh. 1-S), tax returns from 2012 through 2016 (*see* Plf. Exh. 5-9), and a sampling of Huntington bank account monthly statements from 2014, 2015, 2019, 2020, and 2021 (*see* Plf. Exh. 16). These exhibits, and the parties' testimony about them, gave the court a broad outline of Ran-Starr's financial situation, but also left many gaps.

3.   <u>The Positions of the Parties.</u>

As with almost every issue in this litigation, the parties' interpretation of the evidence before the court – and their overall concept of fair value – is vastly divergent. Herremans' view of Ran-Starr's value focuses heavily on the value of the real estate, and specifically, on the 2018 Broersma Appraisal.  He advocates for adoption of Broersma's valuation of the real estate at $665,000, plus a "modest 5% increase in value per year."

20

He further encourages the court to add in amounts for assets like furniture, fixtures, and equipment based on entries on Ran-Starr's 2019 balance sheet.   For other assets, such as cash on hand, Herremans asks the court to rely on a March 2021 bank statement, which happens to be greatly inflated due to Ran-Starr's receipt of PPP funds during that month.   The end result places Herremans' estimate of Ran-Starr's value at $1.4 million and the value of Herremans' one-half interest at $700,000.

Fedo, of course, disagrees.   He asserts that the fair value of Herremans' Ran-Starr stock is equivalent to the "fair market value" established at the state court foreclosure sale, which was held in December 2022.   This approach places the fair value of the stock at $150,000, the amount of Fedo's winning bid at the foreclosure sale.

After carefully reviewing the parties' arguments in light of the evidentiary record and applicable legal standards, the court has determined that neither party's assessment adequately reflects the "fair value" of Herremans' interest in Ran-Starr.   To begin, neither party has chosen a meaningful or consistent date on which to base the determination of fair value.   As previously noted, courts generally base their determination of fair value on the date the oppressive conduct began, the date the legal action based on the conduct was filed, or another date that is appropriate under the circumstances.   In this case, the court has determined that Fedo engaged in a series of oppressive conduct from 2017 through 2019 by using Ran-Starr funds to pursue litigation against Herremans.[13]

---

[13]   The court notes that Herremans has also alleged many instances of oppression by Fedo dating back to 2015 in this proceeding.   However, the court previously determined that judicial estoppel precludes Herremans from bringing shareholder oppression claims for those actions.   As a result, to the extent using a valuation date as far back as 2015 would benefit Herremans (and the court is not convinced it would) the court declines to do so based on its previous determination that Herremans should not benefit from those claims due to this failure to adequately disclose them in his bankruptcy case.

Herremans' own oppressive conduct in unilaterally withdrawing $15,000 from Ran-Starr's bank account also occurred in 2017.  This adversary proceeding was filed in June of 2017. However, the most credible evidence before the court regarding the value of Ran-Starr's real estate is the Broersma appraisal, which is dated February 22, 2018.  Under the circumstances, the court believes that is an appropriate date on which to value the real estate.  For the non-real estate assets, the court will rely on the December 31, 2017, corporate balance sheets, with certain adjustments as explained below, as representing the evidence closest in time to the real estate appraisal.  Based on this determination regarding the appropriate valuation date, Herremans' assertion that the Broersma appraisal should be adjusted for a five percent increase in value for the years from the date of the report to present must be rejected.[14]

In addition, when crafting an appropriate remedy under the particular circumstances of this case, this court must also reject Fedo's assertion that the "fair value" of Herremans' interest in Ran-Starr necessarily equates to the "fair market value" as established by the results of the state court foreclosure sale.  Here, if the court were to equate the fair value of Herremans' shares in Ran-Starr with the "fair market value" it would lead to the precise scenario the *Franks* court warned against:  it would permit Fedo to essentially force Herremans out of Ran-Starr without paying a fair price for the value of Herremans' one-half interest.   Specifically, it would permit Fedo to purchase Herremans' interest for $150,000, notwithstanding credible evidence presented at trial that Ran-Starr's real estate alone was worth $665,000 in 2018.  The absurdity of such a result – particular in light of the purpose of the valuation, which is to remedy oppressive

---

14      Fedo's argument that the "fair market value" established by the December 2022 foreclosure sale also fails for this reason.

behavior by Fedo – leads to the inescapable conclusion that it is not appropriate to view "fair value" as synonymous with "fair market value," or to apply other discounts, in this case. For these reasons, the court rejects Fedo's argument that the fair value of a one-half interest in Ran-Starr is $150,000, the amount of Fedo's winning bid at the state court foreclosure sale.

4. The Court's Calculation of "Fair Value."

Unable to completely adopt either party's view of fair value, the court is left in the unenviable position of determining an appropriate valuation based on the limited evidence before it. Although there are many factors that could be considered in this analysis, several of those factors are not relevant here. Others that are relevant have not been adequately addressed. For instance, the evidence at trial included very little credible evidence about Ran-Starr's cash flow or earning capacity and nothing about the market price of stock in similar entities. The evidence that was presented generally painted a picture of a Ponderosa restaurant with fading popularity and which has failed to pay any dividends to its shareholders since 2015. As a result, the court believes that an asset based approach is the most appropriate method for valuing the Ran-Starr stock.[15]

---

[15]      *See* Jeffrey M. Risius, *Buying & Selling a Business in Michigan*, at § 13.32 (ICLE 2d ed. 2003), https://www.icle.org/modules/books/chapter.aspx?lib=business&book=2003551110& chapter=13 (last updated June 30, 2023) (cited herein as "Risius, at § __") (explaining that an asset based valuation is "often utilized in situations where a company is underperforming and is potentially worth more based on a sale of its underlying assets as opposed to continuing as a going concern (i.e., it is worth more dead than alive)"); Nicholas J. Mastracchio Jr. & Alina V. Niculita, *Closely Held Business Valuation*, at ¶ C (Bloomberg Law Accounting Policy & Practice Portfolio 5147-1st), https://www.bloomberglaw.com/product/blaw/toc/source/456438/28036014 (last visited July 14, 2023) (cited herein as "Mastracchio at ¶ __") (explaining that asset-based valuation methods may also be utilized to value a company as a going concern when there is little or no goodwill).

To conduct this analysis, the court will start with Ran-Starr's December 31, 2017, balance sheet (referred to in this section as the "Balance Sheet," Plf. Exh. 1-S).  The court will then adjust the various Balance Sheet entries to reflect the totality of evidence presented at trial and to more accurately approximate a fair value of the company.  That is, to the extent specific balance sheet entries are inaccurate, either by definition (as with assets which are listed at a historic cost rather than at fair value or fair market value) or as demonstrated by other evidence in the record (as with liabilities that were no longer owed based on the testimony presented), the court has adjusted the entries to reflect those realities, rather than accepting them at face value or disregarding them entirely. *See, e.g, Jansen v. Jansen*, 517 N.W.2d 275, 277 (Mich. Ct. App. 1994) (noting that "[a] trial court has great latitude in determining the value of stock in closely held corporations" and does not commit clear error so long as the valuation is "within the range established by the proofs").

In further support of this approach, the court notes that Herremans, as the plaintiff herein, had the general burden of establishing damages.  *See, e.g., Ginnard v. Advanced Design & Prototype Technologies, Inc.*, No. 303162, 2012 WL 4465191, *1 (Mich. Ct. App. Sept. 27, 2012) (unpublished opinion) (under the shareholder oppression statute, "damages must be proved by a preponderance of the evidence, and the plaintiff bears the burden of proof") (citing *Washington v. Jones*, 192 N.W.2d 234, 237 (Mich. 1971)). Given this burden, the court's other option for dealing with balance sheet entries that are demonstrably inaccurate would be to give them no weight and attribute a value of zero to these categories.  This method would get the parties and the court no closer to a true picture of Ran-Starr's value and the court has rejected it for that reason.

24

a. *Assets*.

Real Estate.  Based upon the Broersma Appraisal, the court values Ran-Starr's real estate at $665,000.  To the extent the Balance Sheet reflects a slightly different value for "Building and Land," the court disregards that number in favor of the amount set forth in the Broersma Appraisal.  The separate Balance Sheet entry showing an additional $237,500 for "Land" is also disregarded, as all of the evidence in the trial record indicates there is only one parcel of land, not two.

Cash.  The Balance Sheet indicates the value of Ran-Starr's cash as of December 31, 2017, was $34,094.39.  The court accepts this valuation.[16]

Accounts Receivable.  The Balance Sheet shows a -$111.12 for accounts receivable.  This same amount appears on the December 2015, December 2016, and June 2017 balance sheets.  The court finds it implausible that this number would be negative and would remain unchanged for years on end.  For that reason, the court gives this number no weight and has valued Ran-Starr's accounts receivable at zero.[17]

Inventory.  The Balance Sheet shows inventory with a value of $4,803.01.  Like the accounts receivable entry, the inventory valuation was shown in this same amount on Ran-Starr's balance sheets dating back to December 2015.  That fact suggests to the court that this entry is not accurate.  However, while it is obvious that Ran-Starr has inventory with some value as of December 2017, there is no evidence in the record from

---

[16]     *See* Mastracchio at ¶ C.1.a.i (stating that, in most instances, the book value of cash and cash equivalents can be used in the determination of fair market value).

[17]     The court notes that the Wassink valuation, which was not admitted into evidence, but on which both parties have selectively agreed and relied, also disregarded this number and placed the value of accounts receivable at zero.  (*See* Plf. Exh. 1-H.)

which the court could craft a more reasonable approximation of its value than what is stated on the balance sheet.   As a result, the court will value the inventory at $4,803.01.

Furniture, Fixtures, and Equipment.   The Balance Sheet includes entries for "Furniture & Fixtures" of $49,487.90 and "Equipment" of $90,470.31, for a total of $139,958.21.  The court notes that these balance sheet entries are mostly likely stated on a historic cost basis and, almost by definition, do no reflect the fair value of these assets.[18]  See Risius, at § 13.4 (explaining that to the extent balance sheets are prepared in accordance with generally accepted accounting principles, they are "stated on a historical cost basis, not on market value.").   The evidence at trial contained almost no information that would aid the court in valuing these assets.   The Broersma Appraisal includes photographs of the furniture and equipment in the dining room, kitchen, and servers' station of the Ponderosa restaurant and it is clear from the photos that the furniture and much of the equipment is dated.   However, the Broersma Appraisal specifically excludes any analysis of the value of these items.   Brad Hansen also testified that the Ponderosa franchisor demanded significant upgrades when the franchise agreement was being renewed and renegotiated in 2016.  His emails to Fedo show that significant updates to the interior of the restaurant were being requested at this time. (See Plf. Exh. 15, at p. 72-75.)

---

[18]      There was very little evidence presented at trial regarding preparation of the balance sheets.  Fedo generally testified that Ran-Starr's financial statements were prepared by Paul Piper, who was not a CPA, but was a professional accountant who handled Ran-Starr's bookkeeping.  (Trial Tr. at 26-27.)  Fedo further explained that Piper prepared the financial statements using raw data that Fedo provided.  (Id.)  In his prior deposition testimony, which was not admitted into evidence at trial, Fedo specifically stated that the furniture and fixtures were shown on the Ran-Starr balance sheets at their historic cost.  (See Plf. Exh. 1.)

The Wassink valuation contains a detailed discussion of the estimated value of these items.  After summarizing explanations provided by Fedo regarding the furniture, fixtures, and equipment, consulting an equipment appraisal company, and touring the restaurant himself, Wassink estimated the value of the items at salvage value, which was approximately twenty percent of their book value, or $28,000.  Again, although the Wassink valuation did not come into evidence at trial, it was referred to repeatedly by the parties and Fedo testified that he generally agreed with its conclusion.  (Trial Tr. at 42.)  Importantly, as an officer of Ran-Starr with extensive first-hand knowledge of its operations, Fedo is competent to give an opinion as to the value of the corporation's property.  *See In re Smith*, 267 B.R. 568, 573 n.3 (Bankr. S.D. Ohio 2001) ("Courts generally hold that a property owner is competent to give an opinion of the value of his/her property under Fed. R. Evid. 701."); *see also Lativafter Liquidating Trust v. Clear Channel Communications, Inc.,* 345 F. App'x 46, 51 (6th Cir. 2009) (unpublished opinion) (trial court did not abuse its discretion by permitting investor and board member with knowledge to provide testimony about diminution of company's value).  The court agrees with Fedo and has determined to adopt the approach utilized by Wassink to value the furniture, fixtures, and equipment at approximately twenty percent of their book value.  The court believes that utilizing this estimate most closely reflects the economic reality and general evidence in this case, which establishes that the furniture, fixtures, and equipment are not worth the amount attributed to them on the company's balance sheets, but also have a value that is greater than zero.  The court values these items at $28,000.

Vehicles.  The Balance Sheet includes an entry valuing "Vehicles" at $98,033.64.  This identical number also appears on Ran-Starr's balance sheets for 2008, 2017 and

27

2019.  The unchanging nature of the value listed for the vehicles suggests that these assets, like the furniture and equipment, are listed on the Balance Sheet at their historic cost rather than their actual market value.  More importantly, although there was some testimony at trial regarding the use of Ran-Starr funds to purchase vehicles for both Fedo and Herremans over the years (*see, e.g.*, Trial Tr. at 287; 415), there is no evidence in the record indicating that Ran-Starr currently owns these vehicles or owned them as of December 31, 2017.  There is likewise no evidence from which the court could determine their fair value.  Accordingly, the court has valued the category of "Vehicles" at zero.[19]

Accumulated Depreciation.   The Balance Sheet entry of -$592,031.00 for "Accumulated Depreciation" was for tax and accounting purposes only.  Because this number bears no meaningful relationship to the actual value of Ran-Starr's assets, and because the court has already adjusted the real estate and furniture, fixtures, and equipment from their book value to their fair value, the court has disregarded this entry in its calculation.

Additional Adjustments for the Parties' Oppressive Conduct.  The court notes that both parties committed oppressive conduct that involved removing assets from Ran-Starr prior to the December 31, 2017, valuation date.  The evidence at trial established that Fedo began using corporate funds to finance litigation against Herremans in January 2017 and continued doing so through October 2019.  Of the $25,793 in Ran-Starr funds that were used to pay Fedo's personal legal fees during this time period, the court finds

---

[19]     The court notes that the Wassink valuation employed similar reasoning, based on the fact that the vehicles were "no longer owned."  Fedo's testimony that he agreed with the Wassink valuation further supports the court's conclusion that the balance sheet figures were incorrect.

that $14,658 of the payments were made prior to December 31, 2017.[20]  *See* Redacted Plf. Exh. 1-X; *see also* Plf. Exh. 1-W and 11.   Herremans also committed oppressive conduct toward Fedo by unilaterally withdrawing $15,000 from Ran-Starr's bank account at Shelby State Bank in May of 2017.  The court has carefully considered the appropriate remedy for these violations and has determined that the best way to account for these actions is to add these amounts back into to the valuation of Ran-Starr's assets.  Stated slightly differently, but for the oppressive actions of both Fedo using $14,658 for personal legal fees and Herremans withdrawing $15,000 in cash for his personal benefit, Ran-Starr's assets would have included an additional $29,658 as of December 31, 2017.  The court will add this amount into its valuation.

b.  *Liabilities*.

Payroll and Sales Tax Liabilities.  The court notes that, in most instances, the book value of liabilities is indicative of their fair market value.  *See* Mastracchio at ¶ C.1.c.  As a result, the court accepts the stated values of -$2,898.72 for "Payroll Liabilities" and $24,259.75 in "Sales Tax Payable" as accurate values for those obligations.

Notes Payable.   The Balance Sheet includes entries for "Notes Payable West Central MI" at -$1,625.11 and "Notes Payable Colson's SBA" at $3,538.51.  Both Fedo

---

[20]     The court's calculation of this amount includes the following payments made by Ran-Starr to Ledford and Associates:  $613.28 of the payment made on January 10, 2017 (total payment of $750.78 less $137.50, which was shown to be for general corporate business); $5,281.25 of the payment made on July 18, 2017; a $5,490.97 payment made on September 12, 2017; a $2,117.50 payment made on October 10, 2017; a $385.00 payment made on November 14, 2017; and a $770.00 payment made on December 12, 2017.  *See* Plf. Exh. 1-W and 11; Redacted Plf. Exh. 1-X.

The remainder of the payments for Fedo's personal legal fees, in the amount of $11,135, occurred after December 31, 2017.  Because these payments were made after the date the court has selected for its valuation, it is not appropriate to account for these amounts in the valuation analysis.  The use of these Ran-Starr funds by Fedo for his personal benefit, and to the detriment of Herremans, was part and parcel of Fedo's on-going oppression of Herremans.  The remedy for that oppression is to order Fedo to purchase Herremans' shares at fair value.

and Herremans testified that these bank debts had been paid off by 2017 (Trial Tr. at 90; 397.) Even so, these entries continue to appear on Ran-Starr's year-end balance sheets for 2018 and 2019. Based on the trial record, these entries must be disregarded and valued at zero. The court has also disregarded the entry for "NCC Line of Credit – Overdraft," based on the undisputed fact that all bank debt had been paid off by December 2017.

Notes Payable to Fedo. The Balance Sheet includes an entry for "Notes Payable Randy Equipment" in the amount of $9,251.46 and "Notes Payable – Randy" of $67,994.98. Unlike the bank debt, the trial record establishes that these amounts were still owed to Fedo as of 2017. Although the amount of these obligations has remained the same on the Ran-Starr balance sheets dating back to 2006, that appears to be correct in this instance, as the evidence submitted at trial established than Ran-Starr had paid Fedo "interest only" on these loans since their inception. (Trial Tr. at 91.) Accordingly, the court finds that these entries correctly reflect the amounts owed to Fedo.

In summary, the court's calculation of Ran-Starr's fair value is as follows:

| ASSETS | |
| --- | --- |
| Real Estate | $ 665,000.00 |
| Cash | $ 34,094.39 |
| Inventory | $ 4,803.01 |
| Furniture, fixtures & equipment | $ 28,000.00 |
| Adjustment for Payments of Fedo Legal Fees | $ 14,658.00 |
| Adjustment for Herremans Withdrawal | $ 15,000.00 |
| TOTAL ASSETS | $ 761,555.40 |
| | |
| LIABILITIES | |
| Payroll Liabilities | $ (2,898.72) |
| Sales Tax Payable | $ 24,259.75 |
| Notes Payable Randy Equipment | $ 9,251.46 |
| Notes Payable – Randy | $ 67,994.98 |
| TOTAL LIABILITIES | $ 98,607.47 |

TOTAL "FAIR VALUE"                                              $ 662,947.93

FAIR VALUE OF ½ INTEREST                              $ 331,473.97

The fair value of Herremans' one-half interest in Ran-Starr is $331,473.97.  To remedy Fedo's oppressive conduct toward Herremans, the court will order Fedo to purchase Herremans' shares in Ran-Starr for $331,473.97.

B.  *Damages for Violation of the Automatic Stay*.

At the invitation of the court, and based on the court's prior determination that Fedo willfully violated the automatic stay by seeking entry of an *in personam* money judgment against Craig and Lynda Herremans in the state court foreclosure action, Herremans submitted a bill of costs detailing the attorney's fees and expenses that were incurred in the state court to ensure that the money judgment was not entered.  These fees and expenses totaled $1,243.50.  Fedo was given an opportunity to object to the bill of costs, but he did not do so.  As a result, the court will award Herremans attorney's fees and costs in the amount of $1,243.50.

In addition to the bill of costs, Herremans filed a request for modification of the Liability Opinion to permit recovery of actual damages, including costs and attorneys' fees, that were incurred in establishing the stay violation in this adversary proceeding.[21] When a willful violation of the automatic stay occurs, as it did here, § 362(k)(1) provides that "an award of actual damages is mandatory." *In re Stringer*, 586 B.R. 435, 446 (Bankr. S.D. Ohio 2018), *aff'd*, 820 F. App'x 429 (6th Cir. 2020).  As Herremans correctly argues, attorney's fees are a component of actual damages and often include both the fees incurred in putting a stop to the initial stay violation as well as litigation undertaken to

---

[21]     *See* AP Dkt. No. 187.

31

obtain a remedy for the violation.  *See Springer v. RNBJ RTO, LLC (In re Springer)*, No. 16-3007, 2017 WL 3575859, at *5 (Bankr. W.D. Ky. Aug. 16, 2017) (unpublished opinion) ("[B]oth pre-litigation attorney's fees and attorney's fees incurred after the filing of a complaint are compensable under § 362(k).")  Therefore, the court agrees that it is appropriate to modify the Liability Opinion, which was not a final determination, to allow for consideration of an award of attorney's fees and expenses incurred in establishing the stay violation in this adversary proceeding.

The bill of costs submitted by Herremans in support of his request for additional attorney's fees attached invoices from the law firms of Moothart & Sarafa, PLC, Howard Law Group, and Passenger Law for services provided to Herremans in this adversary proceeding.  On these invoices, five entries, for fees totaling $2,217.10, pertain directly to addressing the automatic stay violation.  The court agrees that Herremans is entitled to an award of attorney's fees for these amounts.  The other entries pertain to the adversary proceeding in general and include tasks such as preparing exhibits and attending the trial.  As to these amounts, Herremans' counsel estimates that fifteen percent of the fees should be attributed to pursuit of the stay violation.  While the court appreciates counsels' attempt to apportion their fees to the specific issue of the stay violation, the court does not believe this estimate is sufficiently certain to support an award of attorney's fees on this basis.  It is well-settled that damages awarded for stay violations may not be based on "mere speculation, guess, or conjecture." *Archer v. Macomb County Bank*, 853 F.2d 497, 499 (6th Cir. 1988) (citations omitted).  Attributing any percentage of the general attorney's fees incurred by Herremans in this litigation to the stay violation

32

is exactly that:  a mere guess.  Therefore, the additional attorney's fees awarded to Herremans for amounts incurred in pursuing this litigation will be limited to $2,217.10.

After issuance of the Liability Opinion, the court also invited the parties to brief the issue of whether an award of punitive damages was appropriate for the stay violation. Both parties did so.[22]  Not surprisingly, Fedo argues that punitive damages are not appropriate, given the benign nature of the actions taken in the state court and his belief that his request was permissible under the language of the confirmed plan.  Herremans counters that Fedo's "brazen" collection attempt nearly caused "catastrophic" harm to the Debtors and argues that an award of punitive damages "in the $100,000 range" is warranted.

Section 362(k) gives this court discretion to award punitive damages for willful stay violations "in appropriate circumstances."  11 U.S.C. § 362(k)(1); *see Weary v. Poteat*, 627 F. App'x 475, 477 (6th Cir. 2015) (unpublished opinion).  Punitive damages may be appropriate when the creditor's "conduct was egregious, vindictive, or intentionally malicious" and are intended to both punish and deter such conduct.  *In re Bello*, 612 B.R. 389, 395-96 (Bankr. E.D. Mich. 2020) (citations omitted); *In re Dougherty-Kelsay*, 601 B.R. 426, 450 (Bankr. E.D. Ky. 2019), *aff'd*, 2022 WL 9730003 (6th Cir. Oct. 17, 2022). "To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so."  *In re Bello*, 612 B.R. at 396 (citations omitted).

In this proceeding, the court declines to award punitive damages to Herremans. Fedo unquestionably violated the automatic stay by seeking entry of a money judgment

---

[22]     *See* AP Dkt. Nos. 185 & 186.

against the Herremans in the state court. However, the court does not find that the conduct of Fedo or his counsel was egregious, vindictive, or intentionally malicious. Counsel for the Herremans intervened and prevented entry of the proposed money judgment in the state court. Other than the actual attorney's fees incurred in opposing entry of the judgment, which the court has already awarded, no other harm or damages resulted to the Herremans from Fedo's actions. The court also credits Fedo's assertion[23] that the language in the proposed judgment was intended to effectuate the requirements of the Debtors' Sixth Pre-Confirmation Plan Amendment as he understood it: that is, he believed the total amount of the debt needed to be established in the state court and that the language of the Debtors' Plan, which required both of the Herremans to continue making annual payments to Fedo until his debt was paid in full if the proceeds from the stock sale were not sufficient to do so, permitted Fedo to seek a judgment on the terms he proposed in the foreclosure action. While these subjective beliefs may have been mistaken, they support Fedo's assertion that he did not act with actual knowledge that he was violating the Herremans' rights or with reckless disregard of those rights when he submitted the proposed judgment. Under the circumstances, punitive damages are not appropriate.

---

[23]    *See* Fedo's Brief Regarding Damages, AP Dkt. No. 186; Transcript of Hearing Regarding Remedies and Damages, AP Dkt. No. 189 at 50-52.

## V.    CONCLUSION.

In summary, the court shall order Fedo to purchase Herremans' shares in Ran-Starr, Inc. for $331,473.97.  The sale shall be consummated by August 31, 2023, unless that deadline is extended by agreement of the parties.  In accordance with the Debtors' confirmed Plan,[24] 60% of the net proceeds of the sale shall be distributed to secured creditors Gerald and Bernice Shafer, successors in interest to Chemical Bank, and 40% of the net sale proceeds shall be distributed to Fedo.  Fedo may offset his claim to 40% of the net proceeds against the purchase price of Herremans' Ran-Starr stock, but shall tender cash to account for the costs of sale and the Shafers' 60% claim on the net proceeds.[25]

In addition, Herremans is awarded a money judgment against Fedo for attorney fees and expenses incurred due to the automatic stay violation in the amount of $3,460.60.  A separate judgment and order shall be entered accordingly.  Because entry of this court's order directing the purchase of Herremans' Ran-Starr shares at fair value renders the state court foreclosure sale moot, the court will also enter an order sustaining

---

[24]    *See* Order Confirming Chapter 12 Plan of Reorganization, Base Case Dkt. No. 142 (incorporating Sixth Pre-Confirmation Amendment to Chapter 12 Plan of Reorganization, Base Case Dkt. No. 140); *see also* Stipulation Regarding Security Interests in Ran-Starr, Inc., Base Case Dkt. No. 138.

Because the sale of the Debtor's Ran-Starr stock was contemplated in the confirmed plan, and the agreement regarding the 60-40 split of the net proceeds was incorporated by reference therein, the court finds that no additional notice of the sale of the stock is required in the base case.  The order confirming the Debtors' plan was served on all creditors on February 11, 2016.

[25]    The court rejects Herremans' argument that Fedo should be required to deposit the sale proceeds with the Chapter 12 Trustee for distribution in accordance with the confirmed plan.  *See* AP Dkt. No. 185, at 8.  The asset being sold – Herremans' Ran-Starr stock – is subject to the properly perfected security interests of the Shafers and Fedo.  The value the court has assigned to the stock is far less than the amounts owed to the secured parties.  Their liens will attach to the sale proceeds, and the net sale proceeds will be distributed in accordance with the 60-40 formula.

the Debtors' objection to the foreclosure sale and declining to approve the sale in the

base case.

**IT IS SO ORDERED.**

**Dated July 18, 2023**



James W. Boyd
United States Bankruptcy Judge